OAKS *v.* OAKS.

4-7430                                                    183 S. W. 2d 292

Opinion delivered November 13, 1944.

*Rowell, Rowell & Dickey,* for appellant.

*Chas. R. Reinberger,* for appellee.

GRIFFIN SMITH, Chief Justice. November 12, 1943, Mrs. Jack T. Oaks was granted a decree of divorce on her complaint charging cruelty. In addition to other property settlements, effectuated through commissioners provided for by the Court, the plaintiff (appellant here) was awarded half in value of U. S. Savings Bonds worth, at the time of trial, $2,874. The decree also authorized Mrs. Oaks to use her maiden name, Tommye Louise Cooper.

Jack T. Oaks formerly owned and operated, in Pine Bluff, a liquor store, a lunch stand, and later a road house called the Casino. He married Miss Cooper in October, 1938, at Shreveport, Louisiana, where she was employed by the J. C. Penney Company. Formerly she had been in Pine Bluff and had worked for Oaks. After marriage appellant began helping her husband. She testified that the business was in the nature of a partnership. Most of the bonds were purchased by appellant with partnership funds, although in a few instances transactions appear to have been handled by the husband. For a while the securities were kept in the couple's Casino room, but at Mrs. Oaks' insistence were transferred to a Simmons National Bank lock box, to which husband and wife had access. The bonds were payable to "Jack T. Oaks or Mrs. Tommye Oaks, 620 Cherry Street, Pine Bluff."

Mrs. Oaks left Pine Bluff July 12th and visited friends in Chicago. When she returned Jack informed her of his divorce intentions. On the eighth of July she had opened the lock box and had seen the bonds. Her husband testified that the only time he had opened the lock box was two days after his wife returned from Chicago, on July 22, and the bonds were missing.

By petition of December 1st the former wife asked that Oaks be required to appear in Court for further examination. Responding, Oaks challenged the Court's authority to reopen the decree. When overruled on this point Oaks again denied *having* the bonds, or knowing *where* they were, or *who* had them; but, when asked to sign an affidavit approved by the Treasury Department (in consequence of which duplicates would be issued) he first expressed a willingness to do so, but when told by counsel in open court that he should not subscribe, declined. After considerable argument at cross purposes, Oaks, in effect, gave as a reason for his attitude an unwillingness to assert that the bonds were lost, stolen, or destroyed.

The Court ruled that, in view of attending circumstances, the respondent could not be compelled to sign the affidavit. This was correct. Physical compulsion could

not be applied; nor could the judicial process be carried to the extent of commanding acquiescence to the exclusion of alternative privileges.

But the Court was not without a remedy if evidence preponderated in support of petitioner's position that Oaks, through wilfulness rather than inability, failed to meet the issue fairly. The record reflects a possibility that the respondent shrewdly took advantage of the way questions were asked, and while answering truthfully from a literal point of view, withheld information that might have solved the Court's problem. It is quite possible that Oaks did not *take* the bonds; that he did not know *where* they were; that he did not know anyone who knew *where* they were or who might have them. When asked a question involving knowledge of the bonds and related facts, Oaks replied, "I will answer that question all at one time: I didn't get the bonds, I don't know where the bonds are, and I haven't seen them."

It will be observed that this answer does not exclude the possibility that, without getting the bonds, without seeing them, and without knowing where they were at any time subsequent to July 8th, Oaks could have connived with another to assist in such manner that he (Oaks) would not know who had the securities, who actually took them from the box, or where they were being kept. It is in evidence that a confidential adviser to Oaks, following the divorce hearing, stated that the defendant was well satisfied with the results, and after three years had run (affording immunity against prosecution for perjury) could cash the bonds.

Appellee's conduct in refusing to sign the affidavit and in declining to seek reissue of the bonds can be explained only on the theory that he hopes to avoid consequences of the decree. The reason assigned does not carry conviction. If he intended, by the testimony given, to say that he did not, directly or indirectly, have anything to do with disappearance of the bonds, and did not know where they were, *nor have any means of ascertaining that information or power to recover them,* then, certainly, they were lost insofar as he was concerned. Mrs.

Oaks had testified unequivocally that they were lost to her.

The decree will be reversed and the cause remanded with directions, (a) to render judgment against appellee for $1,437 and interest, and (b) if not paid within ten days or secured to the satisfaction of appellant, to remand appellee to jail as for contempt, unless, in the meantime, he shall fully coöperate in the procurement of duplicate bonds by signing the affidavit in question, or by turning over to appellant half of the bonds now missing.